**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

DEARBORN MID-WEST
COMPANY, LLC and DEARBORN
HOLDING COMPANY, LLC,

              Plaintiffs,

v.                                    Case No. 22-cv-12114

F M SYLVAN, INC. et al.,

              Defendants.
_____/

**ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR EX PARTE TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

On September 7, 2022, Plaintiffs filed suit in this matter, alleging violations of the

Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, the Michigan Uniform

Trade Secrets Act ("MUTSA"), Mich. Comp. Laws § 445.19021, *et seq.*, and the

Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, as well as claims for breach

of contract, common law unfair competition, statutory and common law conversion, and

civil conspiracy. (ECF No. 1, PageID.23–47.)

Plaintiffs also filed a "Motion for *Ex Parte* Temporary Restraining Order and

Preliminary Injunction." (ECF No. 2) On September 8, 2022, the court resolved to deny

the TRO portion of Plaintiffs' motion and to hold in abeyance Plaintiffs' request for a

preliminary injunction pending receipt of further information. (ECF No. 9.) After

convening the parties for a status conference on September 19, 2022, the court set the

preliminary injunction question for hearing. (ECF No. 17.)

Before the hearing, Defendants briefed responses to Plaintiffs' motion. (ECF Nos. 24, 29, & 30.) On October 21, 2022, Plaintiffs filed a reply brief. (ECF No. 35.) Thereafter, with the motion fully briefed, the court held a hearing, at which witness testimony was presented by both parties over the course of three days, spanning October 26, 2022 to October 28, 2022. The court took the matter under advisement to prepare this order.

Having considered the evidence presented,[1] and for reasons explained below, the court will GRANT Plaintiffs' request for a preliminary injunction.

## I. BACKGROUND

This case springs from an alleged misappropriation of Plaintiffs' confidential and trade secret information by Plaintiffs' former employees, Defendants Pandolfi, Dorchak, and Eid, for the benefit of their new employer—and Plaintiffs' direct competitor— Defendant F M Sylvan, Inc. (ECF No. 1, PageID.2.) Plaintiff Dearborn Mid-West Company ("DMW") has been in the automotive industry since the 1940s, specializing in the production, installation, and maintenance of materials handling solutions, i.e., conveyor systems. (Id.) Such conveyors are used by major automakers to assemble vehicles on factory floors. (Id. at PageID.4–5.) In building its industry reputation, strong enough to cater to original equipment manufacturers (OEM) like the Big Three[2], DMW has developed a number of proprietary standards critical to its success. (Id.) At issue in this case is the alleged theft and dissemination of three categories of confidential and

---

[1] The court's factual observations, and the inferences and findings emerging therefrom, are only those necessarily determined to resolve the instant preliminary motion. A more complete record often develops as a case progresses.

[2] General Motors, Ford Motor Company, and Chrysler Stellantis North America comprise the colloquially known "Big Three," as the largest automakers in the United States.

trade secret information: (1) engineering standards for DMW's material handling systems and products; (2) quality assurance processes and procedures; and (3) financial, pricing, and costing information. (ECF No. 2, PageID.77.)

Defendant F M Sylvan ("Sylvan") is a Michigan corporation involved in several industries, including the automotive. (ECF No. 24, PageID.201–02.) Over the last ten years, Sylvan has developed a favorable reputation as an installer of conveyor systems, earning itself OEM clients that include the Big Three. (Id. at PageID.202–03.) Sylvan has also performed sub-contracting work for DMW in the past, but more recently began positioning itself as a direct competitor to DMW. (Id.; ECF No. 1, PageID.5.) Sylvan's ability to compete with DMW, which DMW characterizes as sudden and newfound, is a central issue in the lawsuit at bar. (Id.) While it was interested in hiring Defendants Dorchak and Pandolfi due to their lengthy industry experience, Sylvan maintains that the employment was expressly contingent on Dorchak and Pandolfi's promises not to disrupt DMW's business in their new capacities or to take or use any confidential information from their former employer. (ECF No. 24, PageID.203–06.) Defendants Dorchak and Pandolfi signed employment agreements containing said provisions when they came to work for Sylvan in February of 2021. (Id.) Further, Sylvan asserts that DMW was aware of the reemployment, as it sent Defendants Dorchak and Pandolfi cease-and-desist letters on February 17, 2021, related to alleged violations of a non-solicitation provision in their DMW employment agreements. (Id.)

DMW alleges that Sylvan's competitive rise is attributable to "unfair competition, theft of proprietary and confidential information and trade secrets, and other violations of law," schemes which included the poaching of key, long-term DMW employees

Dorchak, Pandolfi, and Eid. (ECF No. 1, PageID.5–6.) Defendant Dorchak began

working for DMW in or around 1997. (Id. at PageID.6.) By the time of his resignation in

February of 2021, Defendant Dorchak was a DMW Vice President and the point person

for DMW's client relationship with one of the Big Three OEMs. (Id.) Defendant Pandolfi

began working for DMW in 2011. (Id. at PageID.7.) Like Defendant Dorchak, Defendant

Pandolfi was also a DMW Vice President at the time of his departure in February of

2021 with similar high-profile client responsibilities. (Id.) Both Defendants Dorchak and

Pandolfi were immediately employed by Sylvan in February of 2021 after leaving DMW.

Defendant Eid had two stints of employment with DMW, first from 2015 to 2018 and

second from 2020 until August of 2021. (Id. at PageID.7–8.) When he left his

employment with DMW, Defendant Eid was a Project Manager. (Id.) Defendant Eid

found reemployment with Sylvan soon thereafter, in August of 2021.

In their capacities as vice presidents and/or project managers, Defendants

Dorchak, Pandolfi, and Eid had varying levels of access to the confidential and trade

secret information at issue. (ECF No. 1, PageID.10–12.) At the start of their employment

with DMW, each signed an "Inventions/Confidentiality/Noncompetition/Software

Agreement," containing covenants to abide by certain confidentiality and non-solicitation

requirements.[3] (Id. at PageID.6–7; ECF Nos 1-2, 1-3, & 1-4.) Beyond agreeing to hold

secret and confidential any and all knowledge technical information, business

information, developments, trade secrets, know-how, and confidences of DMW, these

---

[3] While not argued in the briefing, at oral argument, Defendants did raise a potential
issue with these agreements because the company involved was DMW's predecessor,
Dearborn Mid-West Conveyor Co. However, Defendants provided no supporting
evidence or legal authority that would render these agreements inoperative in the case
at bar.

Defendants also agreed to promptly return any and all written confidential information received from DMW and to destroy any transcripts or copies of said information upon ending their employment with DMW. (ECF No. 1-2, PageID.85; ECF No. 1-3. PageID.62–63; ECF No. 1-4, PageID.67–68.) Further, any inventions made or conceived by these Defendants, either solely or in collaboration with others during their employment with DMW, would remain the sole and exclusive property of DMW, whether patented or not. (ECF No. 1-2, PageID.57; ECF No. 1-3, PageID.61; ECF No. 1-4, PageID.66.)

DMW alleges that, before they left DMW, Defendants Dorchak, Pandolfi, and Eid "collectively downloaded, transferred, and/or copied thousands of files containing DMW's highly confidential, proprietary, competitively sensitive, and trade secret [information] onto their personal devices or personal email accounts." (ECF No. 2, PageID.77.) DMW further characterizes this information as "the lifeblood of DMW," developed through the investment of "millions of dollars and even more hours of work and time by it and its employees." (Id.) As proof of said misappropriation, DMW provides findings from a forensic audit conducted by DataExam, LLC, in July of 2022 of electronic devices used by Defendants Dorchak, Pandolfi, and Eid during their tenure at DMW. Plaintiff explains that the audit was prompted in early spring of 2022 by DMW employees' observations of Sylvan employees installing material handling systems that appeared to be identical to the products fabricated by DMW. Such installation was being performed as part of a $30 million project at the Stellantis Jefferson North Assembly Plant (JNAP) for which Sylvan successfully out-bid DMW. (ECF No. 1, PageID.22–23.) Based on its experience in the automotive industry, DMW alleges that "it would be

impossible for Sylvan to so closely reproduce DMW's products and services without using DMW's Confidential and Trade Secret Information to do so." (Id. at PageID.22.) DMW further alleges that, "[b]ased on DMW's experience in the industry, it would also be impossible for Sylvan, as a new entrant into the industry, to develop materials handling systems, solutions, and processes in just a few months that are comprehensive and sophisticated enough for Sylvan to win a contract with an OEM." (Id.)

Ultimately, in September of 2022, DMW filed suit to combat Defendants' "brazen theft and unauthorized use of DMW's trade secrets, proprietary standards, and other confidential competitive information." (ECF No. 1, PageID.2.) Plaintiffs' nine-count complaint makes the following claims: Count I, Breach of Contract against Dorckak, Pandolfi, and Eid; Count II, Misappropriation of Trade Secrets – Defendant Trade Secrets Act, at U.S.C. §§ 1836 *et seq.*, against all Defendants; Count III, Misappropriation of Trade Secrets – Michigan Uniform Trade Secrets Act, Mich. Comp. Laws §§ 445.1901 *et seq.*, against all Defendants; Count IV, Unfair Competition – Common Law, against Sylvan; Count V, Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*, against Dorchak, Pandolfi, and Eid; Count VI, Conversion – Common Law, against all Defendants; Count VII, Conversion – Mich. Comp. Laws § 600.2919a, against all Defendants; Count VIII, Civil Conspiracy – Common Law, against all Defendants; and Count IX, Injunctive Relief, against all Defendants. (ECF No. 1.)

**II. STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of

right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008); *see also Overstreet v.*

*Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) ("A

preliminary injunction is an extraordinary remedy which should be granted only if the

movant carries his or her burden of proving that the circumstances clearly demand

it."); *Roghan v. Block*, 590 F.Supp. 150, 153 (W.D.Mich. 1984), *aff'd* 790 F.2d 540 (6th

Cir. 1986) ("There is no power the exercise of which requires greater caution,

deliberation, and sound discretion, or more dangers in a doubtful case, than the

issuance of an injunction.") (citation omitted). "[T]he proof required for the plaintiff to

obtain a preliminary injunction is much more stringent than the proof required to survive

a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

However,

> The purpose of a preliminary injunction is merely to preserve the relative
> positions of the parties until a trial on the merits can be held. Given this limited
> purpose, and given the haste that is often necessary if those positions are to be
> preserved, a preliminary injunction is customarily granted on the basis of
> procedures that are less formal and evidence that is less complete than in a trial
> on the merits. A party thus is not required to prove his case in full at a preliminary
> injunction hearing.

*University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

A plaintiff seeking a preliminary injunction must establish that (1) it has a strong

likelihood to succeed on the merits; (2) it is likely to suffer irreparable harm without the

injunction; (3) the injunction would not cause substantial harm to others; and (4) an

injunction is in the public interest. *Winter*, 555 U.S. at 20; *ACLU of Ky. v. McCreary Cty.,*

*Ky.*, 354 F.3d 438, 445 (6th Cir.2003). "A district court is required to make specific

findings concerning each of the four factors, unless fewer factors are dispositive of the

issue." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997) (citation omitted). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Id.* at 400 (citation omitted). "No single factor will be determinative as to the appropriateness of equitable relief." *Id.* With that said, a finding that there is no likelihood of irreparable harm or no likelihood for success on the merits is usually fatal. *Winter*, 555 U.S. at 21 (irreparable harm); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir.2000) (success on the merits).

### III. DISCUSSION

Plaintiffs seek injunctive relief with respect to seven of their eight claims, excluding their civil conspiracy claim.[4] They make individualized arguments with respect to the likelihood of success on the merits for each claim and general arguments for the likelihood of suffering irreparable harm, the lack of substantial harm to others, and the public interest favoring an injunction.

### A. Likelihood of Success on the Merits

A party "is not required to prove his case in full at a preliminary injunction hearing." *Camenisch*, 451 U.S. at 395. However, "[i]n order to establish success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp.*, 119 F.3d at 402 (citing *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 n. 4 (6th Cir.1977)). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make

---

[4] Technically, Plaintiffs pled a total of nine claims, the ninth being for Injunctive Relief.

them a fair ground for litigation and thus for more deliberate investigation." *Id.* (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

## 1. MUTSA Displacement

Before delving into an individual analysis of each claim, the court will first address Defendants' argument that certain tort claims advanced by Plaintiffs are "preempted" by their MUTSA claim, thereby compromising their likelihood of success on the merits. MUTSA provides a statutory action and remedies for misappropriation of trade secrets. Mich. Comp. Laws §§ 445.1903–1904. The statute also displaces conflicting tort remedies for misappropriation of a trade secret. *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich. App. 125, 132, 649 N.W.2d 808, 812–13 (2002); *see Bliss Clearing Niagra, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 946 (W.D. Mich. 2003). In relevant part, Mich. Comp. Law § 445.1908 provides that:

> (1) Except as provided in subsection (2), this act displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.
>
> (2) This act does not affect any of the following:
>
>> (a) Contractual remedies, whether or not based upon misappropriation of a trade secret.
>>
>> (b) Other civil remedies that are not based upon misappropriation of a trade secret.
>>
>> (c) Criminal remedies, whether or not based upon misappropriation of a trade secret.

"In determining whether a claim is displaced, courts generally examine whether the claim is based solely upon the misappropriation of a trade secret. If so, the claim must be dismissed." *Bliss Clearing Niagra, Inc.*, 270 F. Supp. 2d at 946.

9

Here, Defendants collectively contend that MUTSA displaces the following claims: unfair competition (Count IV); common law and statutory conversion claims (Counts VI and VII); and civil conspiracy (Count VIII). Plaintiffs counter that its conversion claims are not displaced because they are not limited to trade secrets, but instead encompass any confidential and proprietary business information improperly taken by Defendants. (ECF No. 35, PageID.548.) Plaintiffs argue similarly with respect to their unfair competition claim, asserting that it covers a broader range of misconduct other than misappropriation, including fraud, bad-faith misrepresentation, and product confusion. (Id. at PageID.548–49.) Plaintiffs do not address Defendants' civil conspiracy argument, presumably because the injunctive relief sought does not encompass that claim.

The court is not inclined to determine at this stage in the proceedings whether Counts IV, VI, VII, and VIII of Plaintiffs' Complaint should be dismissed as displaced. Rather, resolution of that issue is more appropriate for a properly briefed dispositive motion in which the court would be provided with more complete briefing. Based on the facts of this case, the question of MUTSA displacement is rendered inconsequential at this stage. Issuance of a preliminary injunction here largely turns on the likelihood of Plaintiffs' success on their statutory trade secret misappropriation claims. Taking Defendants' viewpoint that the tort claims are preempted, the court's determination as to the likelihood of success on the merits with respect to Plaintiffs' MUTSA claim would still effectively extend to these other torts. Conversely, assuming that the claims are not displaced, in the court's view, the success of these secondary torts has no strong bearing on the question of whether a preliminary injunction should issue. Rather, as it

relates to Counts II, III, IV, VI, and VII, the court's primary focus for this first factor is on the merits of Plaintiffs' MUTSA and DTSA claims.

## 2. Counts II & III: Violations of DTSA & MUTSA

"In substance, the elements of a misappropriation claim under MUTSA and the DTSA are largely identical." *FCA US LLC v. Bullock*, 446 F. Supp. 3d 201, 212 (E.D. Mich. 2020) (citing *Radiant Global Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1124 n.2 (E.D. Mich. 2019)). Both statutes provide causes of action and remedies for the misappropriation of trade secrets. *See* Mich. Comp. Laws § 445.1902(b); 18 U.S.C. § 1839(5)); *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 946 (W.D. Mich. 2003). The elements of a claim of misappropriation of a trade secret are as follows: (1) the existence of a trade secret; (2) its acquisition in confidence; and (3) the defendant's unauthorized use of it. *Rothschild v. Ford Motor Co.*, 2 F. Supp. 2d 941, 950 (E.D. Mich. 1998).

MUTSA defines a "trade secret" as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

(*i*) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(*ii*) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902(d). In determining what information constitutes a trade secret, Michigan courts further consider the following factors:

(1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of

information to owners and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.

*Dura Global Techs., Inc. v. Magna Donnelly Corp.*, 662 F. Supp. 2d 855, 859 (E.D.

Mich. 2009). DTSA defines a "trade secret" as:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

**(A)** the owner thereof has taken reasonable measures to keep such information secret; and

**(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

18 U.S.C. § 1839(3).

"Misappropriation" under MUTSA is either of the following:

(*i*) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(*ii*) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

(A) Used improper means to acquire knowledge of the trade secret.

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Mich. Comp. Laws § 445.1902(b); *see also* 18 U.S.C. § 1839(5) (same definition with different formatting). "Improper means" include "theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means," but "does not include reverse engineering, independent derivation, or any other lawful means of acquisition." Mich. Comp. Laws § 445.1902(a); 18 U.S.C. § 1839(6).

### a. Plaintiffs' Argument

Plaintiffs argue that their engineering standards, quality assurance processes, and financial, pricing, and cost information all qualify as trade secrets. With respect to the engineering standards, Plaintiffs contend that they: "have economic value to DMW because they are the result of decades of research and innovation; provide the blueprints through which DMW fabricates the conveyor systems and other materials handling solutions that it markets and sells to customers; and are critical to DMW's ability to attract clients and compete in the marketplace." (ECF No. 2, PageID.101.) Plaintiffs further assert that these standards are highly confidential and not publicly known, highlighting the strict limits DMW places on access, i.e., only members of the engineering team can edit the standards out of necessity, and only vice presidents and project managers have read-only access to the standards. (Id.) Plaintiffs also point to the confidentiality agreements signed by all employees that embrace these standards. (Id.) Plaintiffs further contend that Defendants have clearly misappropriated their standards, referring to the forensic audit and the reports from DMW employees of Sylvan employees installing nearly identical materials handling products. (Id. at PageID.102.)

With respect to their quality assurance processes, Plaintiffs contend that, "[l]ike DMW's product standards, these quality assurance processes are the result of decades of investment, experience, and development; are the cornerstone of DMW's most valuable service line; and give DMW a competitive edge in the marketplace." (ECF No. 2, PageID.102.) Plaintiffs further assert that access is also limited to only those employees and contractors who need to know the information and the processes are contemplated in the confidentiality clauses signed by all employees. (Id.) Finally, though conceding that its specific knowledge of Defendants' misconduct is constrained by the general norm within the automotive industry not to publicize contract award winners, Plaintiffs nonetheless point to "the fact that Defendants actually possess DMW's quality assurance files and have already used DMW's engineering standards to replicate DMW's products strongly indicate that Defendants will use the quality assurance processes in the same manner. See *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 813 (Mich. Ct. App. 2002) (stating that "evidence of duplicity" by former employee and identification of "a specific trade secret that defendants were likely to misappropriate" can support a claim of threatened misappropriation)." (Id. at PageID.103.)

With respect to their financial, pricing, and cost information, Plaintiffs assert that, "[p]ut simply, that pricing and cost information is what allows DMW to financially compete for contracts, is extremely competitively sensitive, and provides DMW with a distinct competitive advantage. In the hands of a competitor, DMW's pricing and cost information would help ensure that competitor could underbid DMW and win a contract." (ECF No. 2, PageID.103.) Plaintiffs contend that the forensic audit report shows that

Defendants Dorchak, Pandolfi, and Eid very likely downloaded, copied, or transferred these files onto their personal removable devices and are thus in possession of them. (Id. at PageID.104.) Further, Plaintiffs rely on the fact that Sylvan won a $30 million contract away from DMW as strongly indicative that Defendants have actually used this financial information to unfairly compete with DMW. (Id.) For these reasons, Plaintiffs argue that they are likely to succeed on the merits of their DTSA (Count II) and MUTSA (Count III) claims against all Defendants.

At the preliminary injunction hearing, Plaintiffs bolstered these arguments with significant testimony from the individual who conducted the forensic audit, Adam Kelly, and from DMW employees, including DMW President Todd Begerowski, DMW Director of Quality Assurance Sharath Mekala, DMW Director of Estimation Jason Benson, and DMW Director of Engineering Chris Hahn. Mr. Kelly thoroughly and credibly explained his report produced in connection with his audit, highlighting specific files that appear to have been saved or copied from DMW's internal network to various external devices connected to the DMW laptops used by Defendants Dorchak, Pandolfi, and Eid during their tenure at DMW. Mr. Kelly indicated that the activity gleaned from the individual Defendants' work laptops is consistent with "data exfiltration," that is, data being copied onto an external device or email causing it to "leave the building," so to speak.

While Mr. Kelly indicated that this activity could also be consistent with innocent employees backing up their laptops, Mr. Mekala testified that it was not normal for DMW employees to backup confidential documents onto their personal devices because company servers did such backing up weekly. Mr. Mekala further indicated that he personally reviewed the names of the files found on the external devices from Mr.

Kelly's report and cross-referenced them against DMW files with the exact same nomenclature. He asserted that, based on the nomenclature, confidential DMW files were likely exfiltrated, citing specific examples of file folders for the court including DMW's Bid folder, Standards folder, General Conditions folder, and Sub-Scope of Work folder. Based on the timing of when the individual Defendants received their offer letters from Sylvan, as discovered in the forensic audit, Mr. Mekala found their apparent access to such broad swaths of information suspicious and concerning. Mr. Mekala's testimony was credible and cogent.

As it relates to the specific information that was likely accessed and taken, Mr. Begerowski, Mr. Mekala, Mr. Benson, and Mr. Hahn all attested to the confidential and trade secret nature of it in DMW's eyes. Mr. Begerowski and Mr. Hahn testified to what DMW's engineering standards are, indicating that they are the blueprints or building blocks of DMW's products detailing the way a particular system is supposed to function. Furthermore, while discussing specific design schematics presented in the hearing under seal, Mr. Hahn indicated that while he was not surprised by Sylvan's ability to create a functioning conveyer system, he was alarmed that certain specifications used by Sylvan to create products for the JNAP project were identical to DMW's, referencing a comparison of the parties' respective safety decline devices as an example. Mr. Hahn, who personally observed Sylvan's installation work in the Stellantis JNAP plant, particularly noted a small number of holes found on both devices that were not filled and had no function; they existed on DMW's device due to a flaw in past design plans that were not problematic and were never corrected.

Mr. Hahn also testified to the nature of certain redundant welding standard notes on a selected Sylvan standard sheet; when compared with the corresponding DMW standard, they are identical. He described as well the identical specifications apparent on the companies' respective "take up devices." While such specifications could have been derived from reverse engineering one of DMW's products, Mr. Hahn opined that, based on the identical nature of the specifications and the limited time Sylvan had to complete its JNAP project deadline, Sylvan used DMW's standards to create its products.

Mr. Begerowski and Mr. Benson testified as to what comprises DMW's financial, pricing, and costing information, explaining to the court DMW's "green sheets" in the context of making a bid for a particular project. Mr. Benson walked through DMW's development of its green sheets estimation program for costing conveyer systems, indicating that it is comprised of formulas informed by hundreds of thousands of data points tracked since DMW's inception as a company. While theoretically capable of giving pricing estimates on certain materials due to his 29 years of experience at DMW, Mr. Benson emphasized his almost exclusive reliance on DMW green sheets in swiftly and accurately developing a bid for DMW. Mr. Benson further expressed his surprise that Sylvan was on the bid list for the JNAP project, given his understanding of Sylvan's limited capabilities on a project of that scale, and asserted that neither Defendant Dorchak nor Pandolfi would have been able to put together a competent bid in the time allotted for the JNAP project without access to an estimation program like DMW's green sheets. Mr. Begerowski described the green sheets as being key to DMW's competitive advantage in the industry and central to producing quotes quickly. He further described

"Construction in Progress" (CIP) and "Work in Progress" (WIP) financial tools that are kept confidential except for an auditor who signs a non-disclosure agreement. Mr. Begerowski indicated that CIPs are an overview from an accounting standpoint of all of DMW's billings and receivables while WIPs are project-specific financial data.

Mr. Begerowski and Mr. Mekala further testified to the safeguards DMW has in place to ensure that the aforementioned information is well-secured. Both asserted that DMW limits access to various drives on DMW's network containing confidential and trade secret information. Mr. Mekala indicated that, as vice presidents, Defendants Dorchak and Pandolfi would have had read-only access to files containing DMW's standards and bid information and full access to ongoing automotive project files. Mr. Mekala further indicated that, as a project manager, Defendant Eid would have had access to DMW's standards and assigned automotive projects and no access to bid files. However, the witnesses also clarified that, based on the purported time of access and ongoing work at DMW, certain folders that appeared to have been accessed by the individual Defendants through external devices should not have been. For example, Mr. Hahn commented that Defendant Eid had no reason to access the standards for DMW's trolley device in his last days of work. Mr. Benson indicated that Defendant Dorchak had no reason to access DMW's bid files in that manner that he did, particularly the "Masters File" folder that contains all eighteen forms or green sheets used to produce costings for conveyers, in his last month of work.

Mr. Kelly, Mr. Begerowski, Mr. Mekala, Mr. Benson, and Mr. Hahn all provided testimony which is credited by the court as weightier and more persuasive than any testimony presented in opposition to the facts stated in such witnesses' presentation.

### b. Defendants' Argument

Defendants' chief counterargument is that Plaintiffs have failed to sufficiently identify the applicable trade secrets at issue, a factor fatal to their MUTSA and DTSA claims. (ECF No. 24, PageID.210.) In so arguing, Defendants rely heavily on *Apex Tool Group v. Wessels*, 119 F. Supp. 3d 599, 609 (E.D. Mich. 2015), wherein the court denied a preliminary injunction request in part because "the only evidence submitted [wa]s a breakdown of the file names on defendant's devices. Standing alone, [the court found that] the file names [were] not helpful." Defendants analogize *Apex Tool* to the case at bar, contending that Plaintiffs have produced only file names up to this point. Defendants further note that many of the files, based on their names, appear facially to not be trade secrets but personal information. (ECF No. 24, PageID.212.) Defendants also argue that, without identifying the alleged trade secrets at issue, Plaintiffs cannot establish that anything was acquired in confidence or that Defendants have been using anything belonging to Plaintiffs since they left DMW's employ. Because more is required than establishing "the existence of generalized trade secrets and a competitor's employment of the party's former employee with knowledge of the trade secrets," *CMI Int'l*, 251 Mich. App. at 134, 649 N.W.2d 808, Defendants argue that Plaintiffs have failed to meet their burden of proof. (ECF No. 24, PageID.213.)

At the preliminary injunction hearing, Defendants offered witness testimony from individual Defendants Dorchak, Pandolfi, and Eid to support their arguments. Each flatly refuted the allegations of misappropriation against them and asserted that their own industry experience was sufficient to make Sylvan's conveyor systems program competitive quickly. Defendant Pandolfi detailed his 27 years of experience in the

materials handling systems industry, explaining how this experience combined with his own industry contacts assisted him in formulating Sylvan's successful bid for certain packages of the JNAP project. He indicated that created his own bidding sheets once he began working at Sylvan, limited in scope to particular systems that Sylvan was able to produce. He further explained that Sylvan was able to complete its portion of the JNAP project by reverse engineering certain DMW devices and buying certain proprietary parts directly from DMW. Defendant Pandolfi also alleged his purported regular practice of using external devices to back-up his "C-drive" on DMW's network, which contained his personal information.

While he acknowledged that some DMW business information was contained in the drive—as he said he learned through Mr. Kelly's forensic audit report—Defendant Pandolfi averred that any copying over of such information was incidental. Defendant Pandolfi further disclosed that, approximately two months' ago, he intentionally discarded one of the external devices referenced in Mr. Kelly's report because, he said, it had been "corrupted."

Defendant Dorchak similarly detailed his 40 years of experience in the material handling systems field, which assisted him in building Sylvan's conveyor program from scratch along with four others, including Defendant Pandolfi. While he assisted Defendant Pandolfi with furnishing some material pricing for Sylvan's JNAP bid, Defendant Dorchak indicated his primary focus in his first few months at Sylvan was getting the conveyor program organized and hiring new employees. He also attested to regularly using external devices in his work at DMW, backing up his personal information from his "C-drive" with some frequency, about quaterly. Defendant Dorchak

also disclosed that he had intentionally disposed of an external device referenced in Mr. Kelly's forensic audit report sometime in the spring of 2022 but thought that another device might contain the same information.

Defendant Eid also detailed his work as a project manager while at DMW, discussing his access to job-specific DMW standards and WIPs and frequent use of USBs and external storage devices when interacting with DMW clients. He further testified that he had no need to steal DMW standards or drawings because such information is readily available and provided by customers within the industry. Defendant Eid also pointed to the use of 3D imaging technology as a way to create 3D models with exact specifications of particular devices within a plant. Though he did not work specifically on Sylvan's safety decline device for the JNAP project, Defendant Eid offered as an explanation for the device's similarities to DMW's that, when following a client's instructions to exactly copy an existing device in the client's plant, it would be safer to keep holes that might appear useless. Defendant Eid also disputed the characterization of green sheets as the brain of the estimating process, instead calling them a good tool. Defendant Eid did admit to connecting a minimum of six external devices to his DMW laptop. He admitted that he intentionally disposed of all of them at BestBuy. He further admitted to taking with him certain files and models that he personally created in his work at DMW when he departed employment, just as he had done when leaving his former employer, Automatic Systems, Inc.

### c. Analysis

After careful review of the parties' briefings and witness testimony, the court finds that Plaintiffs have a strong likelihood of success on the merits for their DTSA and

MUTSA claims. In coming to this conclusion, the court first notes the lack of credibility of the individual Defendants' respective testimony. By disposing of relevant external storage devices despite being on notice in February of 2021 of potential litigation, Defendants Pandolfi and Dorchak, based on the testimony thus far, have intentionally spoliated evidence, thereby preempting any attempt Plaintiffs might make to identify more precisely the nature of what was improperly taken by Defendants. Given the lapse in time between such notice and the filing of this action, these actions may not be outrageous, but they are certainly redolent.

In sum, the disposal of the devices leads the court to reject as not fully credible the testimony offered by Defendants Dorchak and Pandolfi. Put simply, the disposal of devises as described herein is just too convenient to be plausible. And, as noted above, the behavior roadblocks any ability for Plaintiffs to provide the very specificity demanded by Defendants. Moreover, to the extent that Defendants attempt to argue that they were expressly permitted by agreement to destroy DMW business information at the time of their departures, the destruction of the devices at issue here does not cure what appears to be very strong evidence of spoliation. Nor are the court's related credibility concerns cured. If Defendants are to be taken at face value, the devices in question would still be in their possession had they not been corrupted or deemed useless. Thus, their destruction or more importantly the intent behind their destruction, was not to fulfill Defendants' sudden need to effectuate post-employment responsibilities more than year after their departures.

The court further finds that Defendant Eid's credibility is also not entirely intact. While not under the same notice as his fellow defendants, Defendant Eid exhibited a

repeated reluctance to answer the questions posed to him during the preliminary injunction hearing. It is unclear to the court whether this can be attributed more to a willfulness on Defendant Eid's part or a product of a language barrier, Defendant Eid not being a native speaker of English. Nonetheless, the court has its concerns and can therefore not fully accept as credible his testimony.

Turning to the court's assessment of the merits on Counts II and III, the court finds that Plaintiffs have sufficiently demonstrated (1) the existence of a trade secret, (2) its acquisition in confidence, and (3) the defendant's unauthorized use of it. With respect to the first element, the court finds that Plaintiffs have specifically identified as trade secrets the following information: any and all DMW standards; any and all DMW non-standards; any and all DMW green sheets; DMW CIPs; DMW WIPs; all files contained in DMW's Sub-Scope of Work folder; DMW general conditions; and any and all files contained on DMW's network in the R-drive, K-drive, and/or L-drive. Through the testimony of Mr. Begerowski, Mr. Mekala, Mr. Benson, Mr. Hahn, and Mr. Kelly, Plaintiffs have sufficiently identified the aforementioned information and how it derives independent economic value from not being generally known to or ascertainable by its competitors within the material systems handling industry. Furthermore, Plaintiffs have sufficiently demonstrated their efforts to guard the secrecy of this information by requiring all employees and third-party vendors to sign nondisclosure agreements, by limiting the levels of employee access to certain personnel depending on necessity, and by protecting the information on a company-specific network. Additionally, Plaintiffs have thoroughly addressed the value of this information to DMW as a company,

detailing the 75-year history of its development through DMW's own trial and errors and the time it would take for a competitor to acquire the same information.

With respect to the second element, the court finds that Plaintiffs have sufficiently demonstrated how Defendants acquired the information in confidence. As it relates to individual Defendants Dorchak, Pandolfi, and Eid, based on the testimony provided, there is no dispute that each of these individuals had varying levels of access to some of the information identified as trade secrets as part of their employment with DMW and actually used this information to complete their work. As it relates to Sylvan, the court finds that, based on its own employment agreements with the individual Defendants prohibiting them from using DMW's confidential and trade secret information, Sylvan knew that it was hiring individuals with knowledge of DMW's trade secrets for a very specific purpose: to develop and launch Sylvan's own conveyor systems department.

Perhaps most importantly, Plaintiffs have sufficiently shown that Defendants likely used Plaintiffs' trade secret information in an unauthorized manner. The court finds particularly persuasive the evidence presented regarding the identical nature of Sylvan's safety decline device when compared to DMW's device, as well as the identical welding plan notes within the companies' respective standards. Plaintiffs provided credible testimony that, based on Sylvan's prior position in the industry as being primarily a pipe installer, it would have been impossible for Sylvan to develop functioning conveyor systems for the JNAP project within its deadlines.

Furthermore, the court finds the sheer volume of confidential file downloads by the individual Defendants and the timing of said downloads to be strongly suggestive of misappropriation. As such, at this stage in the proceedings, Plaintiffs are likely to prevail

24

on the merits of their MUTSA and DTSA claims, a finding which thereby weighs in favor

of issuing a preliminary injunction.

### 3. Count I: Breach of Contract

"The elements of a breach of contract claim under Michigan law are as follows:

(1) a contract between the parties, (2) the terms of the contract require performance of a

certain action, (3) a breach, and (4) the breach caused injury to the other party." *Collins*

*v. CitiMorgage, Inc.*, 974 F. Supp. 2d 1034, 1041 (E.D. Mich. 2013) (citations omitted).

Plaintiffs contend that Defendants Dorchak, Pandolfi, and Eid agreed

unambiguously to abide by a confidentiality clause in their employment contracts that

expressly covers "information or business secrets relating to the customer, strategies,

business, conduct or operations of [DMW]" and "any of [DMW]'s customer lists, pricing

and purchasing information[.]" (ECF Nos. 1-2–1-5.) As such, Plaintiffs argue that these

Defendants violated the confidentiality clause when they "downloaded, transferred,

copied, or shared DMW's Confidential and Trade Secret Information onto personal

electronic devices and accounts; use[d], directly or indirectly," that information "for

[their] own benefit or for the benefit of [Sylvan]"; and "disclose[d]" that Information to

Sylvan." (ECF No. 2, PageID.106.) Plaintiffs argue that they are therefore likely to

succeed on the merits of their contract claim against Defendants Dorchak, Pandolfi, and

Eid.

While Sylvan is not the subject of Plaintiffs' breach of contract claim, it

nevertheless indicates that Defendants Dorchak, Pandolfi, and Eid warranted that they

did not breach any agreement with Plaintiffs and further that they had not provided

Sylvan with any confidential information. Defendants Dorchak and Pandolfi rely on

*Follmer, Rudzewicz & Co., P.C. v. Kosco*, 420 Mich. 394, 362 N.W.2d 676 (1984), and

*Rehau, Inc. v. ColorTech*, No. 5:90:CV:57, 1993 WL 960794 (W.D. Mich. Feb. 8, 1993),

to argue that Michigan law does not support the enforcement of confidentiality

provisions when demonstrably confidential information is not involved because an

employer only has a valid interest in protecting truly secret information. (ECF No. 29,

PageID.364–66.) Defendants Dorchak and Pandolfi assert Plaintiffs' breach of contract

claim therefore depends on proof of trade secrets, which it has not properly identified

(for reasons explained more fully below). As such, they say, the claim does not have a

likelihood of success on the merits. Defendant Eid makes largely the same argument

but attacks the Complaint for failing to identify any specific protected information. (ECF

No. 30, PageID.406–07.)

 Because the same factual allegations used to support Plaintiffs' contract claim

also support its misappropriation claims, the court will largely rely on and refer to its

previous analysis to find that Plaintiffs have a strong likelihood of success as to their

contract claim. However, the court will further note that Defendant Eid likely committed

an additional contract breach by taking certain files that he created or invented with him

upon his departure from DMW based on his testimony at the preliminary hearing. As

such, because Plaintiffs are likely to succeed on their contract claims, issuance of a

preliminary injunction is further supported.

### 4. Count V: Violation of the Computer Fraud & Abuse Act

 The Computer Fraud and Abuse Act (CFAA) prohibits certain conduct involving

unauthorized access to computers. *See* 18 U.S.C. § 1030(a)(1)–(a)(7). While primarily a

criminal statute, it permits "[a]ny person who suffers damage or loss by reason of a

violation of this section [to] maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." *Id*. § 1030(g).

Here, Plaintiffs rely on 18 U.S.C. § 1030(a)(2)(C) and (e)(6), which prohibits a person from "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] information from any protected computer." They argue that Defendants Dorchak, Pandolfi, and Eid were not authorized to download, transfer, or copy DMW's Confidential and Trade Secret Information, including specifically the standards they allegedly conspired to alter by converting to PDF. (ECF No. 2, PageID.108.) Plaintiffs conclude they are thus likely to succeed on their CFAA claim against Defendants Dorchak, Pandolfi, and Eid.

Defendants Dorchak and Pandolfi counter by characterizing Plaintiffs' CFAA claim as one of exceeding authorization. Relying on *Van Buren v. United States*, 141 S. Ct. 1648, 1662, 210 L. Ed. 2d 26 (2021), they argue that exceeded authorization claims under the CFAA are narrowly construed, such that the CFAA does not cover individuals who have improper motives for obtaining information that is otherwise available to them. (ECF No. 29, PageID.368.) Here, because Pandolfi and Dorchak had access to the alleged Confidential and Trade Secret Information in their roles as vice presidents, they argue that any alleged subsequent misuse of that information is not actionable under the CFAA. (Id.) For his part, Defendant Eid asserts that Plaintiffs allege no factual allegations against Defendants and further fail to allege with specificity that Defendants engaged in any conspiracy to violate the CFAA. (ECF No. 30, PageID.409.) Accordingly, Defendant Eid concludes that Plaintiffs fail to show a strong likelihood of success on the merits of this claim. (Id.)

The court does not have enough information at its disposal to determine at this stage whether Plaintiffs will likely be successful on their CFAA claim, as Plaintiffs fail to address Defendants' legal argument under *Van Buren*. The court will need further briefing on the issue. With that said, based on the findings of merit with respect to Plaintiffs' other claims, any finding as it relates to the merits of the CFAA claim is inconsequential to the ultimate question of whether a preliminary injunction should issue.

### 5. Summary

Given the outstanding displacement issue raised by Defendants, Plaintiffs' primary focus on their MUTSA and DTSA claims with respect to the injunctive relief sought, and the inconsequentiality of Plaintiffs' potentially displaced tort claims in light of the court's findings with respect to Plaintiffs' other claims, the court will not analyze the merits of Counts IV, VI, and VII. Based on the court's aforementioned analysis, the court finds that Plaintiffs are likely to succeed on the merits of Counts I, II, III, and V. As such, this factor weighs in favor of issuing a preliminary injunction.

### B. Likelihood of Suffering Irreparable Harm

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington–Fayette Urban Cty. Gov't,* 305 F.3d 566, 578 (6th Cir. 2002). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).

Plaintiffs assert that, as a result of Defendants' theft, unfair competition, and ongoing contractual violations, the value of its confidential and trade secret information and corresponding goodwill and reputation has been substantially harmed. As support, Plaintiffs cite to the following: *Broad-Ocean Techs., LLC v. Lei*, No. 21-11297, 2021 WL 2258418, at *2 (E.D. Mich. June 3, 2021) ("It is well established that the disclosure of trade secrets qualifies as irreparable harm.") (granting temporary restraining order); *Lowry Computer Prods., Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997) ("The loss of consumer goodwill and the weakened ability to fairly compete that would result from disclosure of trade secrets and the breach of a non-compete agreement does establish irreparable injury."); *see also RECO Equip., Inc. v. Wilson*, No. 20-4312, 2021 WL 5013816, at *5 (6th Cir. Oct. 28, 2021) (affirming that plaintiff had shown a likelihood of irreparable harm where "RECO's trade secrets are an important competitive advantage for the company," and "[b]y stealing the secrets, the defendants could speed up their own process and steal customers"); *RGIS, LLC v. Gerdes*, 817 F. App'x 158, 163 (6th Cir. 2020) (upholding finding that "disclosure of RGIS's trade secrets would harm its 'ability to compete with its competitors'" and would constitute irreparable harm); *Handel's*, 765 F. App'x at 125 (recognizing "loss of fair competition and customer goodwill" as irreparable harm); *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 32 (6th Cir. 2011) (affirming that "loss of goodwill, loss of competitive advantage, and loss of research incentives" constitute irreparable harm sufficient to support preliminary injunction). (ECF No. 2, PageID.109–10.)

Defendants' chief counterargument to Plaintiffs' claimed irreparable harm is that Plaintiffs' complaint seeks monetary damages. (ECF No. 24, PageID.220.) Defendants

further characterize Plaintiffs' arguments on this factor as conclusory. (Id. at 220–21.) While conceding that the loss of customers' goodwill can be considered irreplaceable harm, Defendants again cite to *Apex Tool*, noting that "[w]hether or not the loss of customer goodwill amounts to irreparable harm often depends on the significance of the loss to the plaintiff's overall economic well-being." *Apex Tool Group, Inc.*, 119 F. Supp. 3d at 699 (citing *Nexteer Automotive Corp. v. Korea Delphi Auto. Sys. Corp.*, No. 13-CV-15189, 2014 WL 562264, at *10 (E.D. Mich. Feb. 13, 2014)). (Id.) Here, based on Plaintiffs' own touted success as a company, Defendants' argue that Plaintiffs do not show how they run the risk of being driven out of business by an alleged misuse of trade secrets. (Id. at PageID.221.)

Defendants Dorchak and Pandolfi further highlight what they characterize as "an unprecedented delay" by Plaintiffs in seeking the extraordinary remedy of a preliminary injunction. (ECF No. 29, PageID.358–59.) They assert that, "DMW's delay is particularly profound, given that immediately after Pandolfi and Dorchak left in February, 2021, its then-counsel threatened a lawsuit against them, cautioned them to preserve evidence, and explained that it had launched an investigation into their alleged breaches. Yet, DMW took no action until it noticed "by accident" (sometime in 2022) that a Sylvan conveyor looked like a DMW conveyor, initiated in July, 2022 a forensic audit of computers that have been in its possession since Pandolfi and Dorchak left, and then still delayed seeking an injunction until two months later." (Id.) Plaintiffs respond to this argument in their reply brief, noting that its cease-and-desist letters were solely related to the non-solicitation clause in Defendants' Dorchak and Pandolfi's employment agreements. (ECF No. 35, PageID.549.)

The court readily acknowledges its prior concern that Plaintiffs' complaint did not allege sufficiently irreparable harm. (ECF No. 9.) However, this was in the context of evaluating—with limited information—Plaintiffs' request for a temporary restraining order (TRO), which has more stringent requirements than a preliminary injunction under Federal Rule of Civil Procedure 65(b). Plaintiffs certainly seek monetary damages and have not adequately explained their delay in filing suit after discovering Sylvan devices identical to their own installed within the JNAP facility. These points cut against a finding of irreparable harm. Nevertheless, the court has now had the benefit of significant testimony from DMW employees, including DMW President Todd Begerowski, DMW Director of Quality Assurance Sharath Mekala, DMW Director of Estimation Jason Benson, and DMW Director of Engineering Chris Hahn. As previously discussed, collectively, this testimony reflects a strong likelihood that Defendants used Plaintiffs' confidential and trade secret information to create identical products, like the safety decline device and take-up device, and use these products to successfully fulfill client expectations. While a profit margin on the JNAP project may be monetarily calculable, the loss of Plaintiffs' competitive advantage due Defendants' likely misappropriation is not. Further, while Plaintiffs enjoy a strong reputation in the automotive industry, so do Defendants. Coupling Defendants industry presence with their likely stolen device capability and access to Plaintiffs' green sheets, the court finds that Plaintiffs have made a strong case for a loss of customer goodwill that cannot be repaired monetarily. As such, this factor weighs again in favor of issuance of a preliminary injunction.

### C. Substantial Harm to Others

In addressing this preliminary injunction factor, Plaintiffs contend that Defendants will suffer no harm from being restrained from their continued use of Plaintiffs' confidential and trade secret information. (ECF No. 2, PageID.110.) Rather, even with an injunction in place, "Defendants will still be able to freely and fairly compete in the industry using their own know-how, information, designs, and processes—data that Defendants develop through their own knowledge, experience, and investment." (Id.)

Defendants counter that they will be substantially harmed by the issuance of an injunction. (ECF No. 24, PageID.222–23.) While they do not take issue with and restraint on use or turning over of confidential information—because none is in their possession—, Defendants do protest that Plaintiffs' request that they turn over "all business and personal computers, phones, hard drives, and devices on which Plaintiffs' confidential, proprietary and trade secret information may reside" is exceedingly broad, unduly burdensome, severely prejudicial, and overly disruptive to Sylvan's business. (Id.) Defendant Eid also asserts, without explaining, that "[r]equiring Defendants to provide Plaintiffs with all devices that may contain DMW Confidential Information could potentially require Eid to travel at least across the United States in search of devices as small as a USB and as indistinguishable as a laptop." (ECF No. 30, PageID.421.)

The court finds that this factor also weighs in Plaintiffs' favor. At this juncture, for reasons already discussed, there is a strong likelihood that Plaintiffs' trade secret information has been compromised and is being used by Defendants for Sylvan's benefit. Defendants cannot be truly harmed by being enjoined from using information that they are not legally entitled to possess. Moreover, to the extent that Defendants thoroughly maintain that nothing of Plaintiffs' confidential information is in their

possession, averments of the same under oath will not be unduly burdensome. The court readily acknowledges that the forensic auditing of devices that Plaintiffs seek to conduct, possibly even of Sylvan's servers, could prove more disruptive. However, again, when considering the strong evidence presented by Plaintiffs as to the alleged misappropriation at hand, the court cannot see how Defendants can be truly harmed by an investigation for information that should not be in Defendants' possession in the first place. As such, this factor weighs in favor of issuing a preliminary injunction.

### D. Public Interest

"The public has an interest in protecting trade secrets, and it is 'axiomatic that that the public has an interest in the enforcement of the legislatively enacted laws.'" *Radiant Global Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1135 (E.D. Mich. 2019) (quoting *Kelly Servs., Inc. v. Noretto*, 495 F.Supp.2d 645, 660–61 (E.D. Mich. 2007)).

Plaintiffs assert that the public interest also weighs in favor of protecting trade secrets, promoting fair competition in the marketplace, and enforcing contractual obligations. (ECF No. 2, PageID.111.) While Defendants concede the existence of a public interest in maintaining trade secret information, they assert the facts of this case do not warrant the extraordinary remedy of a preliminary injunction, especially given the delay on Plaintiffs' part in investigating the allegations at issue and filing suit. (ECF No. 24, PageID.224.)

The court agrees with Plaintiffs that, based on the facts as they currently stand, the public interest in protecting trade secrets weighs in Plaintiffs' favor. The court again acknowledges some delay on Plaintiffs' part in bringing suit, specifically the several

month lapse between the filing of this suit and Plaintiffs' discovery that their products were being copied with extraordinary precision—i.e., down to unintentional errors in the specifications—in the JNAP facility. Plaintiffs' failure to yet provide a satisfactory explanation for the delay is noted. However, such a point sounds more in a lack of irreparable harm, which the court has already addressed, than it does a lack of public interest. Regardless, in light of the court's findings with respect to the other factors, especially the likelihood of success on the merits, a public interest in protecting trade secrets is apparent in this case and supports the issuance of a preliminary injunction.

## IV. CONCLUSION

For the aforementioned reasons, the court concludes that a preliminary injunction shall issue against Defendants in this case as each factor weighs in Plaintiffs' favor. To effectuate this ruling, Plaintiffs are required to submit a refreshed proposed preliminary injunction order in compliance with Federal Rule of Civil Procedure 65(d) that details with specificity the timelines and mechanisms for the information transfer requested. Plaintiffs shall submit this document via email to the court's Case Manager. Accordingly,

IT IS ORDERED that Plaintiffs' Motion for *Ex Parte* Temporary Restraining Order and Preliminary Injunction [ECF No. 2] is GRANTED IN PART to the extent that a preliminary injunction shall issue in this case against Defendants.

IT IS FURTHER ORDERED that Plaintiffs shall submit a refreshed proposed

preliminary injunction order in compliance with Federal Rule of Civil Procedure 65(d),

specifying timelines and mechanisms for the information transfer sought, within seven

(7) days for the court's review and signature.


                                        s/Robert H. Cleland                    /
                                        ROBERT H. CLELAND
                                        UNITED STATES DISTRICT JUDGE


Dated:  November 4, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, November 4, 2022, by electronic and/or ordinary mail.

                                        s/Lisa Wagner                          /
                                        Case Manager and Deputy Clerk
                                        (810) 292-6522

S:\Cleland\Cleland\EKL\Opinions & Orders\Civil\22-12114.DEARBORNMIDWEST.DraftOrderOnPreliminaryInjunction.EKL.docx